IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KERRY CUMMING,

                Plaintiff,

-vs-              NO: 1:17-cv-00376 KG-KBM

QUESTA SCHOOL BOARD OF EDUCATION and QUESTA
INDEPENDENT SCHOOLS,

                Defendants.

DEPOSITION OF ROY HERRERA
January 25, 2018
3:00 p.m.
645 Don Gaspar Avenue
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY:  TIM WHITE
           ATTORNEY FOR PLAINTIFF

REPORTED BY:  Jan Gibson, CCR, RPR, CRR
               Paul Baca Court Reporters
               500 Fourth Street, NW - Suite 105
               Albuquerque, New Mexico 87102

EXHIBIT 4

## Page 10

1  they didn't discuss that, is my understanding. So
2  I'm not sure how to deal with this but I wanted to
3  get this out on the table.
4       MR. WHITE: I'm going to move on and I
5  will figure out what to do with that later.
6       MS. GURULE: I will also concur with that
7  recitation as accurate. As far as my recollection
8  of the events as well is just the conversation was
9  to determine whether representation of Mr. Herrera
10 could occur by myself concurrently with the
11 District.
12    Q  (By Mr. White) Mr. Herrera, did you review
13 any documents to prepare for your testimony here
14 today?
15    A.   Yes.
16    Q.   What did you review?
17    A.   I reviewed the complaint and also my
18 statement.
19    Q.   And what statement are you referring to?
20    A.   Statement A.
21    Q.   Is this a statement --
22    A.   My statement.
23    Q.   -- that you provided in response to my
24 client's EEOC charge, do you know?
25    A.   It was a response to an attorney, Ramon

## Page 11

1  Vigil. He had asked me to give a statement.
2     Q.   Okay. I think we're going to get to that.
3  Did you review anything else before you came in here
4  today?
5     A.   No.
6     Q.   Just those two documents?
7     A.   Correct.
8     Q.   How long have you been employed at the
9  Santa Fe Indian School, sir?
10    A.   Since June of 2013.
11    Q.   And you resigned from Questa August 20,
12 2012; is that correct?
13    A.   Correct.
14    Q.   Between August 20, 2012 and June 2013,
15 were you employed?
16    A.   No.
17    Q.   Was that because you weren't trying to
18 find a new position or was it because it took that
19 long to find a new position?
20    A.   I was not interested in a position.
21    Q.   You just -- what caused you to come back
22 to work then with Santa Fe Indian School?
23    A.   The interest in the position that was
24 being offered.
25    Q.   And how old are you, sir?

## Page 12

1     A.   Sixty-three. Sixty-four.
2     Q.   And what is your ethnicity?
3     A.   I am Hispanic.
4     Q.   On both sides of your family or just one?
5     A.   Both.
6     Q.   When you were the superintendent in
7  Questa, do you know, just your best estimate for me,
8  if you would, how many employees the district had?
9     A.   I do not recall.
10    Q.   Was it more than four?
11    A.   Yes.
12    Q.   Are you certain of that?
13    A.   Yes.
14    Q.   As far as the school, the Alta Vista
15 School there in the Questa school district, do you
16 know the ethnicity of the employees there in terms
17 of were more folks Hispanic, Anglo, African
18 American, Native American? Can you give me your
19 perspective on that?
20         MS. GURULE: Objection, form, foundation.
21         MR. COPPLER: When objections are stated
22 you may answer the question without delay unless I
23 instruct you not to answer, which will probably not
24 be likely.
25    A.   I had never seen the population ethnicity.

## Page 13

1  Visually is my only recollection.
2     Q.   Yes, sir. That's fair.
3     A.   And that would be primarily Hispanic.
4     Q.   Why did you resign from Questa?
5     A.   There was turmoil between the Board
6  itself, and I felt that the PED, Public Education
7  Department of New Mexico, had received several
8  complaints and was going to be potentially filing a
9  claim against Questa.
10    Q.   They, in fact, did do that.
11    A.   That's correct.
12    Q.   You were quoted, I believe, by the PED as
13 saying that the District -- the priority of the
14 school district was not academics. Do you recall
15 making a statement like that?
16    A.   Yes.
17    Q.   What did you mean by that?
18    A.   The Board was focused more on the physical
19 plant and involved in day-to-day activities.
20    Q.   Say the last part again.
21    A.   Involved in day-to-day activities.
22    Q.   Meaning the board members were --
23    A.   Correct.
24    Q.   -- involving themselves with the
25 day-to-day activities?

Page 14

1  A. Correct.
2  Q. There was testimony to the PED in the
3  course of them suspending the Board from a previous
4  superintendent, a gentleman named Albert Martinez.
5  Do you know Mr. Martinez?
6  A. I did meet him.
7  Q. He complained in part about board members
8  interfering with hiring and firing issues. Do you
9  recall that ever happening when you were the
10 superintendent?
11     MS. GURULE: Object to form, foundation.
12  A. No.
13  Q. Did anyone ever contact you, a board
14 member, to say, "Hey, hire this person" or "Don't
15 hire that person"? Any sort of communications like
16 that?
17  A. No.
18  Q. Did the Board -- before you resigned on
19 August 20, 2012, did any board member request that
20 you resign?
21  A. No.
22  Q. Did anyone else request that you resign?
23  A. No.
24  Q. So that was your decision and only yours?
25 Is that fair?

Page 15

1  A. Yes.
2  Q. You were only there about eight weeks; is
3  that right? As superintendent, I mean?
4  A. Correct.
5  Q. Was there anything other than this, what
6  you thought was coming from the PED, that caused you
7  to resign?
8  A. I felt the Board was bickering between
9  each other in regards to me.
10  Q. Concerning you?
11  A. Well, concerning wanting me to go
12 different directions. And I didn't feel like they
13 were academic-oriented, it was more towards
14 facility. And I chose not to be a part of that.
15  Q. So was there -- and I understand what you
16 told me so far, of course, but is there any other
17 reason that we have not talked about that led you to
18 resign?
19  A. No.
20  Q. Did you ever have any work experience
21 before you became superintendent with Martha
22 Sanchez?
23  A. No.
24  Q. Did you only know Ms. Sanchez through the
25 work you did as superintendent for Questa?

Page 16

1  A. Yes.
2  Q. Since you've left Questa, have you had any
3  other professional interaction with Ms. Sanchez?
4  A. No.
5  Q. Do you have any sort of personal
6  relationship with her, socially, I mean?
7  A. No.
8  Q. Do you have any opinion about her
9  truthfulness or lack thereof?
10  A. My only work with Ms. Sanchez was she
11 interviewed for the position of principal at Alta
12 Vista Costilla. I was very impressed with her
13 abilities, with her general philosophy towards
14 education.
15  Q. So you don't have any basis to call into
16 question her credibility in any way from your
17 experience with her; is that fair?
18  A. No, I do not question it.
19  Q. When did you begin working as
20 superintendent there? Do you recall the date?
21  A. I don't recall the date, but I believe it
22 was either early June or could have been late May.
23      MR. WHITE: I apologize, Counsel. I only
24 brought three of each of these because that's the
25 norm.

Page 17

1      MR. COPPLER: I can look on the original.
2      (Note: Exhibit 1 marked.)
3  Q. (By Mr. White) Here is what we are going to
4  mark as Exhibit 1 to your deposition, Mr. Herrera.
5  It's a document titled Notice of Vacancy for the
6  school year of 2012/2013 for an elementary teacher.
7  Do you know if you were working at the time this
8  notice was made public? Working for Questa?
9  A. Yes.
10  Q. Do you recall this notice being something
11 that you put out there or was it something that was
12 in the works before you came?
13  A. I believe this was due to Ms. Sanchez
14 being selected as principal opened up her position
15 as teacher.
16  Q. Where had she been teaching?
17  A. At Costilla Elementary.
18  Q. Is there a reason that you know of why the
19 position is titled just Elementary Teacher as
20 opposed to a more specific position? A certain
21 grade or a certain topic?
22  A. I can only assume that the general posting
23 for an elementary teacher, should positions open up,
24 it's not restricted to just one school.
25  Q. I think I understand what you're saying,

Page 18

1  but what I'm asking I think is a little bit
2  different. Perhaps I didn't phrase it properly.
3  This just asks for or describes a vacancy for an
4  elementary teacher. Do you know why it doesn't
5  specify first grade, fifth grade, math, reading,
6  something more specific than just the generic
7  elementary teacher?
8      A.  Not specifically, but I would say that in
9  my experience many times there's a domino effect.
10 One teacher opening opens up, one within the
11 district applies for it, another opens up, and so in
12 my experience that's what has been the case.
13     Q.  Is that just with Questa or generally as a
14 school administrator?
15     A.  Generally as a school administrator.
16     Q.  Were you involved in reviewing the
17 applications that came in as a result of this notice
18 of vacancy that we marked as Exhibit 1?
19     A.  No.
20     Q.  Who was, do you know?
21     A.  I believe there was a screening committee.
22     Q.  Do you know if that would be different
23 than the committee that ended up doing the
24 interviews of my client and Lisa Rael?
25     A.  I do not know.

Page 19

1      (Note: Exhibit 2 marked.)
2      Q.  Exhibit 2 to your deposition, Mr. Herrera.
3  Do you recognize this as the committee who did the
4  interviews for the applicants for this elementary
5  teacher position?
6      A.  I don't recall seeing this form.
7      Q.  You don't recall ever seeing it before?
8      A.  Correct.
9      Q.  Do you know if, in fact, these five people
10 whose names are listed here were the folks who
11 interviewed my client as a result of her application
12 for this vacancy?
13     A.  I cannot confirm that.
14     Q.  Were you present at any point during that
15 interview of my client, Kerry Cumming?
16     A.  No.
17     Q.  Do you know where the interview took
18 place?
19     A.  No.
20     Q.  Are you pretty certain that you were not
21 present in that same room when the interview was
22 taking place? Because I have some documentation
23 that indicates that you were there at least part of
24 the time. Do you think that's possible and you have
25 just forgotten it or do you believe you really were

Page 20

1  not there?
2      A.  I believe I was not there.
3      Q.  If Ms. Sanchez was to testify to the
4  contrary, would you have any reason to dispute that?
5      MR. COPPLER:  Object to the foundation.
6      MS. GURULE:  Join.
7      A.  I would say, to give you an example.
8      Q.  Sure.
9      A.  If it was at Alta Vista in the start of
10 school year, I was doing a walk-through. They may
11 have seen me. If it was at Costilla, same thing,
12 checking the school to make sure it was ready to go.
13 I was not in an interview.
14     Q.  Do you know how this committee worked in
15 terms of putting forward a candidate to be hired?
16 And by that I want to ask you, is there any weight
17 given, any greater weight given to anyone's vote or
18 recommendation to anyone else on the committee? Do
19 you know how that process worked at that time?
20     A.  Not in Questa but I can respond generally.
21     Q.  Please.
22     A.  The committee has a vote that they rank
23 applicants shared with the principal. The principal
24 has a final determination of the person that goes
25 into a position. The principal will meet with the

Page 21

1  superintendent with the recommendation and move that
2  person forward.
3      Q.  So generally speaking, if we were to apply
4  what you're telling me to these five committee
5  members that we have listed on Exhibit 2, everyone
6  would make recommendations or score the
7  interviewees, talk to Ms. Sanchez about that and
8  Ms. Sanchez brings a recommendation to you; is that
9  correct?
10     A.  Based on my experience, yes. Not having
11 worked long in the Questa system, I can't verify
12 that that was their process.
13     Q.  Do you know if that was the process for
14 this committee? Do you know if that's the way that
15 ended up happening?
16     A.  I do not.
17     Q.  Is that because you don't know or you
18 don't recall?
19     A.  I don't know.
20     Q.  Did you have a conversation with
21 Ms. Sanchez prior to either Ms. Cumming or Ms. Rael
22 being offered a job in terms of what her
23 recommendation would be?
24     MS. GURULE:  Object to form.
25     A.  The recommendation verbally on the phone

6 (Pages 18 to 21)

Page 22

1  was that Ms. Cumming was the recommendation for
2  Costilla. Shortly after that I got a phone call
3  from Ms. Cumming.
4     Q. So if I'm understanding your answer, you
5  never had a conversation with Ms. Sanchez about --
6  or did you have a conversation with Ms. Sanchez
7  about hiring Kerry Cumming? Do you recall?
8     A. The phone conversation.
9     Q. You had a phone conversation with
10 Ms. Sanchez where she recommended hiring
11 Ms. Cumming?
12    A. Correct.
13    Q. But, and I don't want to put words in your
14 mouth because I think you told me a minute ago, was
15 it Ms. Sanchez's recommendation that she be hired to
16 Costilla or Alta Vista or was that not decided?
17    A. The only position we had open was
18 Costilla.
19    Q. And that was to fill the slot that
20 Ms. Sanchez had been in; is that right?
21    A. Correct.
22    Q. So let me ask you this from a general
23 standpoint first, based on your experience as school
24 administrator in New Mexico. In fact, let me ask
25 you this: Have you worked as a school administrator

Page 23

1  other than New Mexico? I think in Washington? Do I
2  recall that correctly?
3     A. Correct.
4     Q. Any other state?
5     A. No.
6     Q. How long have you worked as a school
7  administrator total?
8     A. About 30 years.
9     Q. So in that time as a school administrator,
10 has it been the actual practice of the districts you
11 have been in that the principal's recommendation is
12 generally followed or is that too general for you to
13 really answer?
14       MS. GURULE: Object to form, foundation.
15    A. Generally followed. The principal is the
16 CEO of that building.
17    Q. So when Ms. Sanchez recommended that you
18 hire Ms. Cumming, you didn't have any reservation
19 about doing that? Is that fair?
20    A. No reservation.
21    Q. Did you ever actually meet with her
22 face-to-face before the day -- Ms. Cumming, I
23 mean -- before the day of the new hire orientation
24 that we're going to talk about in a little bit?
25    A. I don't recall meeting her.

Page 24

1       (Note: Exhibit 3 marked.)
2     Q. Let me show you what we have marked as
3  Exhibit 3, Mr. Herrera. Do you recall seeing that
4  document before?
5     A. It looks familiar.
6     Q. Do you know if you would have reviewed
7  this prior to the discussion with Ms. Sanchez where
8  she recommended hiring my client?
9     A. I don't recollect the timeline.
10    Q. Do you know, would it have been -- do you
11 recall, it would it have been the practice for you
12 to have reviewed this before an offer was made to
13 either Ms. Rael or Ms. Cumming?
14    A. I don't recall in the Questa case, but I
15 knew that there were two applicants.
16    Q. Do you know if there were any other folks
17 that were interviewed?
18    A. I don't.
19    Q. Do you know if there were other folks who
20 applied besides these two?
21    A. I don't.
22    Q. Do you know if you ever knew that and you
23 just don't recall now or you just wouldn't have been
24 involved in that part of it?
25    A. I only recall two.

Page 25

1     Q. Do you know whose writing this is on the
2  document?
3     A. I do not.
4     Q. It says "From Martha Sanchez." Do you
5  know if this is Ms. Sanchez's writing?
6     A. I do not.
7     Q. Underneath Ms. Rael's name where it's
8  handwritten, in parentheses it says "Local." Do you
9  know what that was intended to convey?
10    A. Where are you?
11    Q. Where it says "Lisa Rael."
12    A. Over here?
13    Q. Yes, sir. Underneath there it has the
14 word in parentheses "Local." Do you know what
15 that's intended to tell whoever reads this document?
16    A. I don't, other than to me looking at this
17 would be someone that lives in the area or is from
18 the area.
19    Q. And why would that be of note, do you
20 know?
21    A. No, I do not.
22    Q. Did you ever visit with Ms. Rael before
23 she came to work for Questa? Did you ever interview
24 her or talk with her before there was an offer made
25 to her?

### Page 26

1  A. No.
2  Q. So do you have any knowledge about the
3  accuracy or lack of accuracy as to any of the notes
4  about Ms. Rael or Ms. Cumming that are written here
5  on this document?
6  A. No.
7  Q. Do you recall after Ms. Cumming's
8  interview, which I'm going to want you to assume
9  that that was on July 31st, okay? Because I'm
10 looking at Exhibit 3 here -- excuse me, Exhibit 2,
11 where they talk about that being the date. I take
12 it back. I'm sorry. Exhibit 3. The date of this
13 document is 7/31/12. Do you think I read that
14 right?
15 A. On the date?
16 Q. Yes, sir.
17 A. Yes.
18 Q. So let's assume the interview took place
19 on 7/31/12. Do you recall calling Ms. Cumming the
20 next day on August 1st to ask her whether she would
21 want to work for the Questa school district? And if
22 it helps, it's my understanding that both you and
23 Ms. Sanchez were on the phone at the same time in
24 that phone call.
25 A. I do not recall that phone call. I do

### Page 27

1  recall having a conversation with Ms. Cumming on the
2  phone. I don't recall who was present or if I
3  called her or she called me.
4  Q. Do you recall asking Ms. Cumming a
5  question -- and this may be a paraphrase but
6  something along the lines of, "Where do you see your
7  classroom in five years?" Do you recall that?
8  A. No, I do not.
9  Q. Is that a question that you would, in your
10 work as a school administrator, commonly ask folks
11 who are interviewing for a position?
12 A. I would ask that question of an
13 administrator but I have never asked that of a
14 teacher.
15 Q. You have never asked it of an applicant
16 for a teaching position?
17 A. Not that I recall.
18 Q. Is it that you don't have a recollection
19 of asking Ms. Cumming that question or you just
20 don't believe that you did?
21 A. I don't have a recollection.
22 Q. So you might have but it's five years ago
23 so you don't recall that possibly; is that fair?
24 A. I don't recall.
25 Q. Do you recall in the first conversation

### Page 28

1  that you would have had with my client about coming
2  to work at Questa offering her a position at
3  Costilla?
4  A. I don't recall offering the position.
5  What I recall her responding -- like I said, I
6  didn't know it was a call from her. That's what I'm
7  assuming in my recollection, saying that she didn't
8  want to take a job in Costilla. My response was,
9  "We only have a job in Costilla." She mentioned
10 Alta Vista. I told her I would look into it.
11 Q. So you don't recall talking to her about a
12 job at Costilla and her response being, "I'll think
13 about it" and her intending to go meet with
14 Ms. Sanchez to look at the school in the following
15 day or two?
16 A. I don't recall that.
17 Q. Do you think that did not happen or you
18 just don't recall it today?
19 A. I don't recall it.
20 Q. Before the new hire meeting, which was
21 August the 6th, I'm going to represent to you and I
22 would like you to assume that, please, did you have
23 any other conversations with Ms. Cumming?
24 A. The day of the orientation, yes.
25 Q. Yeah, before that, though, did you have

### Page 29

1  any other conversations other than the phone call
2  that we were just talking about?
3  A. No.
4  Q. So if you would then, I want to go to that
5  new hire meeting. That was on a Monday, August 6th.
6  Does that sound right?
7  A. Yes.
8  Q. And do you recall what time of day you
9  would have begun that meeting?
10 A. Not exactly, but it would have been early,
11 8:30, 10:00 o'clock.
12 Q. Do you recall that you led the meeting?
13 You started the meeting up?
14 A. What I did was I introduced the
15 facilitator of the meeting.
16 Q. Okay.
17 A. And I left.
18 Q. Who was that?
19 A. Dr. Harrell Holder.
20 Q. Harrell?
21 A. Harrell, H-A-R-R-E-L-L.
22 Q. And who is Dr. Holder?
23 A. Dr. Holder at the time was a consultant
24 with the Regional Education Center.
25 Q. Do you know if he still is?

8 (Pages 26 to 29)

Page 38

1   A.   I would have offered her the position.
2   Q.   I'm not done. I'm sorry, Mr. Herrera, let
3   me finish.
4   A.   Okay.
5   Q.   It says she refused the offer and
6   Mr. Vigil's description is that she then refused the
7   position. So I don't understand how that happened.
8   Because the first time in the telephone conversation
9   you weren't offering the position, right?
10  A.   Correct.
11  Q.   You didn't offer it until the meeting when
12  you pulled her out of the new hire meeting, correct?
13  A.   Correct.
14  Q.   So when did she have the opportunity to
15  refuse it a second time as this response states, do
16  you know?
17  A.   The offer would have been -- probably
18  would have been communicated by the principal to her
19  when the principal notified her the position -- that
20  she was offering her a position at Rio Costilla.
21  Q.   Do you know that Ms. Sanchez made that
22  offer to my client to work at the Costilla school?
23  A.   I'm assuming yes, because of the phone
24  call from Ms. Cumming to me asking me that she is
25  not interested in Rio Costilla, she is interested in

Page 39

1   Alta Vista. That's when I responded that I would
2   check to see what there was available, if that was
3   the case.
4   Q.   So this response, if one were to read this
5   paragraph that we have been looking at, it seems to
6   be all of one piece. That wouldn't be accurate; is
7   that true?
8   A.   Yes.
9   Q.   And do you recall having the conversation
10  with my client about her not wanting the Costilla
11  job, among other reasons, because it's a further
12  drive from her home in Taos?
13  A.   Yes.
14  Q.   And it's not actually 15 miles, it's
15  actually 20; is that true?
16       MS. GURULE: Objection.
17  Q.   This says 15 but it's 20, right?
18       MS. GURULE: Same objection.
19  A.   I don't know.
20  Q.   Where do you live, sir?
21  A.   Where do I live?
22  Q.   Yes, sir.
23  A.   I live in Santa Fe.
24  Q.   Where did you live at this time when you
25  worked here?

Page 40

1   A.   I lived on campus, the Questa campus, in a
2   teacherage that they had.
3   Q.   So your statement that's marked as Exhibit
4   5, do you know who typed this document up?
5   A.   No, I do not.
6   Q.   On the second page, is that your
7   signature, sir?
8   A.   That is.
9   Q.   And is that your writing where it says
10  1/7/2013?
11  A.   Yes.
12  Q.   Do you know where you were when you signed
13  that document?
14  A.   I do not.
15  Q.   Is this accurate that you told my
16  client -- the very last sentence on the first page
17  of your statement, sir. Is this accurate that you
18  told her she could attend the new staff orientation
19  at the Questa boardroom? Is that correct?
20  A.   Yes.
21  Q.   And you did tell Ms. Cumming that?
22  A.   Yes.
23  Q.   Why would she be attending the new staff
24  orientation if she had not been offered a position
25  yet?

Page 41

1        MS. GURULE: Object to form, foundation.
2   A.   Ms. Sanchez had offered her the position.
3   She had called -- Ms. Cumming had called me to ask
4   if there was a position at Alta Vista. I did not
5   know, but I told her if she wanted to attend the
6   orientation she was welcome.
7   Q.   Why would you tell someone to attend that
8   new staff orientation who had not been offered a
9   job?
10       MS. GURULE: Object to form, foundation.
11  A.   Because I felt based on the recommendation
12  of the principal that she would be a good hire.
13  Q.   But she had refused the Costilla job
14  already is what you told me today, right?
15  A.   She had told me that she preferred Alta
16  Vista.
17  Q.   And that was in the phone call?
18  A.   Correct.
19  Q.   Just so you and I understand each other,
20  I'm going to talk about your conversation with the
21  phone call versus your conversation in the meeting
22  face-to-face. We'll just use the term meeting; is
23  that okay with you?
24  A.   Yes.
25  Q.   Okay. So in the response that we were

11 (Pages 38 to 41)

Page 42

1  just looking at that your lawyer for the district
2  drafted, it says that Ms. Cumming refused the offer
3  at Costilla. Did that not take place in the
4  telephone call?
5      MR. COPPLER: Just so I'm clear, are you
6  referring to Exhibit 5 or Exhibit 4?
7      MR. WHITE: Right now I'm talking about
8  what Exhibit 4 says, the response to the charge.
9      Q. Because in it, it says, "Superintendent
10  Roy Herrera verbally offered Ms. Cumming a teaching
11  position at Rio Costilla," and then it says,
12  "However, Ms. Cumming refused the offer." So what I
13  want to be clear on, Mr. Herrera, is where did that
14  refusal take place? In that telephone call or in
15  the meeting?
16     A. In the meeting.
17     Q. Did Ms. Sanchez ever tell you that
18  previous to the meeting Ms. Cumming refused the job
19  at Costilla?
20     A. No.
21     Q. So if, in fact, she did do that she never
22  advised you of that before the meeting on Monday?
23  Is that true?
24     A. Yes.
25     Q. And do you have a specific recollection of

Page 43

1  telling Ms. Cumming that she could attend the new
2  staff orientation meeting or do you think that
3  Ms. Sanchez did that?
4      A. I did.
5      Q. You did? The second page of your
6  statement, Mr. Herrera, Exhibit 5, you say,
7  "Principal Sanchez informed me that Ms. Cumming was
8  perfect for the position at Rio Costilla." Why was
9  that?
10     A. She was clarifying that there was not a
11  position available at Alta Vista and that
12  Ms. Cumming was a good fit for Rio Costilla.
13     Q. Why? She was perfect for the position, it
14  says here. This is your statement. Why was that?
15         MS. GURULE: Object to form.
16     A. She was strong in math.
17     Q. So when Ms. Cumming came to your office to
18  that meeting out of the new staff orientation
19  meeting, was anyone else present?
20     A. No.
21     Q. Did you document that meeting in any way?
22     A. I did not.
23     Q. Did you have any conversation with
24  anybody, let's say that same day, about that
25  meeting? For example, did you tell Ms. Sanchez what

Page 44

1  had transpired in the meeting?
2      A. Yes.
3      Q. Did you talk to anyone else about what had
4  happened in the meeting like you talked to
5  Ms. Sanchez?
6      A. Not that I recall.
7      Q. Did you tell Ms. Cumming that you would
8  have to rescind the job offer that had been made to
9  her?
10     A. I believe I offered her the job. She said
11  no so I told her I would have to rescind it.
12     Q. So when you used the word "rescind," what
13  you are telling me is you were referring to the
14  offer at Rio Costilla, correct?
15     A. Correct.
16     Q. But she had just refused it, correct?
17     A. I had just offered it.
18     Q. And she said no?
19     A. She said no.
20     Q. Then you said, "Well, then I'll have to
21  rescind the offer"?
22     A. Correct.
23     Q. How do you rescind an offer someone has
24  already refused. I don't think I understand that.
25         MS. GURULE: Object to the form and

Page 45

1  foundation.
2      MR. COPPLER: Object to form and
3  foundation.
4      Q. What did you mean when you said that?
5      MS. GURULE: Object to form and
6  foundation.
7      A. Just to let her know the job would no
8  longer be available.
9      Q. What did she say?
10     A. She thanked me, and I told her that I
11  would pay her for the day and she said thank you and
12  she left.
13     Q. Did she express anything to you as far as
14  being upset? Did she get tearful? Did she ask you
15  why? Did she respond in any way like that?
16     A. No.
17     (Note: Exhibit 6 marked.)
18     Q. So the very next day -- Exhibit 6 -- you
19  offered Lisa Rael a job at Alta Vista, correct?
20     A. I am not aware of that. I see the
21  signature on it but I would assume that it was Rio
22  Costilla. There was only -- that was the only
23  position open.
24     Q. Well, let me represent to you that ever
25  since 2012 Ms. Rael has worked at Alta Vista,

12 (Pages 42 to 45)

Page 46

1  Mr. Herrera.  Do you know how that came to be?
2  A.  No.
3  Q.  So this memo that has your name on it you
4  did not author?  Is that right?
5  A.  That has my name on it.
6  Q.  That is your signature, is it not?
7  A.  That's correct.
8  Q.  Do you have any independent recollection
9  of Ms. Rael going to work at Rio Costilla?
10  A.  No.
11  Q.  If that is true, what I just told you,
12  that she was hired to work at Alta Vista, do you
13  know why that happened or how that happened?
14  A.  No.
15  (Note:  Exhibit 7 marked.)
16  Q.  Let me show you the second exhibit that
17  was provided to the federal government, to the EEOC,
18  in response to my client's complaint that she had
19  been discriminated against.  I am marking this as
20  Exhibit 7.  This is what the district's lawyer sent
21  to the EEOC in response to a request to list the
22  hires, the teaching hires, in the district.  And it
23  shows Ms. Rael was hired on 8/13/2012 to work at
24  Alta Vista Elementary.  Do you see that?
25  A.  Yes.

Page 47

1  Q.  Can you explain how that could be the case
2  when you're telling me, and this response that your
3  lawyer sent into the federal government tells us,
4  that there was no job at Alta Vista?
5  MS. GURULE:  Object to form, foundation.
6  Q.  Do you know how that came to be?
7  A.  No.
8  Q.  Have you ever seen that document before?
9  A.  No, I have not.
10  Q.  Do you know how old Ms. Rael is?
11  A.  No, I do not.
12  Q.  Do you know her or are you acquainted with
13  her in any way?
14  A.  No.
15  Q.  Do you know if she is related to anyone
16  else that serves as a board member in Questa?
17  A.  No, I do not.
18  Q.  Do you know if she is related to anyone
19  else employed by the district?
20  A.  No, I do not.
21  Q.  Before this notice of employment that's
22  marked as Exhibit 6, the one that your signature on
23  it --
24  A.  Yes.
25  Q.  -- do you recall having any conversation

Page 48

1  with Ms. Rael about offering her a job?
2  A.  No.
3  Q.  Do you think you did and it's five years
4  later and you don't recall it or do you think you
5  did not?  If you know?
6  A.  I do not recall it.
7  Q.  Do you recall announcing at a school board
8  meeting on August the 7th that Ms. Rael was being
9  hired to work at Alta Vista?
10  A.  No, I do not.
11  Q.  Do you believe that that did not happen or
12  just with the passage of time you don't recall it?
13  A.  I do not recall.
14  (Note:  Exhibit 8 marked.)
15  Q.  I will show you what we're marking as
16  Exhibit 8 to your deposition.  Do you recall ever
17  seeing this letter?
18  A.  I don't recall.
19  Q.  Do you think that you received it and now,
20  again, five years later you just don't recall?  Or
21  do you think that you did not receive this?
22  A.  I do not recall.
23  Q.  From your previous testimony I'm going to
24  assume that you do not recall ever saying to my
25  client that you can't tell her why she was not going

Page 49

1  to come to work at Questa school district?
2  MS. GURULE:  Object to form, foundation.
3  A.  No.
4  Q.  You don't recall saying that?
5  A.  I never would have said that.
6  Q.  You don't think you did say that?
7  A.  No.
8  Q.  Do you know, as far as the interview
9  process is concerned, at Questa district if the
10  committee doing the interviewing produces notes from
11  their interview of each candidate?
12  A.  I'm not sure about Questa, but usually
13  there's notes taken on candidates.
14  Q.  And would it be -- and I know you don't
15  know about Questa specifically, but from your
16  experience as an educator, as a school
17  administrator, can you think of any reason why we
18  would be missing the interview notes only from
19  Ms. Sanchez concerning the interview with my client?
20  A.  No.
21  MS. GURULE:  Object to form, foundation.
22  Q.  Have you ever had to file a complaint,
23  whether formally or informally, that you felt that
24  you had been discriminated against?
25  A.  No.  I do not recall that.

## Page 58

1  A. No.
2  Q. If Ms. Sanchez had offered Ms. Cumming a
3  job at the Alta Vista campus, would she have been
4  required to seek your approval for that offer?
5  A. Yes.
6  Q. Did she ever seek that approval in any
7  form from you?
8  A. Not that I recall.
9  Q. Did she ever notify you that she had made
10 any kind of offer for employment to Ms. Cumming at
11 the Alta Vista campus?
12 A. No.
13 Q. And at that time in 2012 was the Rio
14 Costilla school part of the Questa Independent
15 School District?
16 A. Yes.
17 Q. And is it your understanding in 2012 that
18 you, as the representative and the hiring and firing
19 authority at Questa Schools, made a job offer to
20 Ms. Cumming for employment at the Questa Independent
21 School District?
22 A. Yes, at Rio Costilla.
23 Q. And was it your understanding in August of
24 2012 that she refused that position?
25 A. Yes.

## Page 59

1  Q. And thereafter as you told counsel you
2  rescinded the offer?
3  A. Yes.
4  Q. Mr. Herrera, I understand that you were
5  not employed at Questa Schools for very long so I
6  understand if you don't remember. And I just want
7  to ask you, do you have any independent knowledge of
8  what grade or classroom Ms. Lisa Rael was assigned
9  to teach at?
10 A. No, I don't. I'm sorry, I should have let
11 you finish.
12 Q. That's okay.
13 A. No, I do not.
14 Q. Do you know if she was assigned to teach
15 third grade?
16 A. No, I do not.
17 Q. Do you know at all what grade she was
18 assigned to teach?
19 A. No, I do not.
20 Q. If the Questa school business records
21 reflect that Ms. Rael in fact taught Pre-K and
22 kindergarten for Alta Vista school, do you have any
23 reason to dispute that?
24 A. No, I do not.
25 Q. Did Ms. Cumming ever express an interest

## Page 60

1  to you during any of the conversations you had with
2  her that she wanted a job teaching Pre-K or
3  kindergarten?
4  A. No.
5  Q. I think you confirmed this but I want to
6  be sure. Did anyone at the school board at the time
7  approach you and tell you that you had to hire white
8  people or not hire white people?
9  A. No.
10 Q. They may have used a different word.
11 Caucasian or anything like that?
12 A. No.
13 Q. And Mr. Herrera, in your experience as the
14 superintendent of a school district in the state of
15 New Mexico, are you authorized to direct the
16 teacher, even current employees, to change their
17 classroom as far as class assignments?
18 A. Yes. May I get some water?
19     MR. COPPLER: I will get that quickly.
20 Q. Have you ever had -- have you ever
21 received any subsequent information about
22 Ms. Cumming from Ms. Valerie Trujillo?
23 A. No.
24 Q. Have you ever spoken with Ms. Valerie
25 Trujillo about the job offer in 2012 to Ms. Cumming?

## Page 61

1  A. No.
2  Q. And Ms. Valerie Trujillo, who was also a
3  superintendent at Questa, was on the hiring
4  committee for these positions in 2012, correct?
5  According to Exhibit 2?
6  A. According to Exhibit 2, yes.
7  Q. Thank you. I'll pass the witness.
8         EXAMINATION
9  BY MR. WHITE
10 Q. Just a couple questions. Mr. Herrera, do
11 you know, looking at Ms. Rael's license, what it
12 means when it says that she has a Limited level 1
13 Extension License?
14 A. No, I do not.
15 Q. That's all I have.
16    MR. COPPLER: He will read and sign. Send
17 it to me. Four to a Page, just e-mail.
18    (Note: The deposition was concluded at
19 4:37)